I would like to reserve about three minutes for a rebuttal if I get there. You don't have anybody on your side? No, Your Honor. I'm a little outnumbered today, but I have the law on my side, so I think I'll be all right. You have the law on your side. All right. Well, that's good. That's good. Thank you. All right. Ready? Go ahead. We're getting ready. Thank you. Thank you, Your Honors. Your Honors, as you know, this is a case about so-called prescription pet food, which is a pet food that the defendants tell the public can only be sold with a prescription, and that's totally false. There is no Federal or State requirement for a prescription to be issued for any of these foods. The plaintiff's challenge is conduct under basically two buckets of claims, a series of State law, consumer fraud claims, and in any case, the district court, on a motion to dismiss, made the same error that district courts in this circuit have repeatedly made and repeatedly been reversed on and dismissed these claims. I'd like to emphasize two points as to each bucket of claims as to why that dismissal was improper. The first and really most important is that this is a failure of the 12b6 standard. Whether a statement is deceptive, whether the representations that are made are false, and whether they cause people to infer other facts that are false are questions of fact for a jury. They're not issues that the Court is supposed to decide. We know this from Williams, Friedman, the Davidson case, the Rubenstein case. Over and over, this Court has said to the district court, these questions of whether something is false or not are not questions to be decided on a motion to dismiss, and yet, here we are. When the defendants represent to consumers through a variety of methods which are explained in detail in the complaint, and, you know, it's funny, after Twombly, the complaints keep getting longer and longer and longer, and it seems like no matter how much detail we put in them they're going to be the same. Breyer. I always ask what happened to the plain and short statement under Rule 8? Gone. It's a relic of history. Well, we're well past that in this case. Defendants tell consumers that this food cannot be sold without a prescription. And worse, they use the Rx symbol, both on some of the bags and with respect to every product at PetSmart itself, on the MedCard, with the fake Rx number, on the signage in the store. Those terms, prescription and Rx, convey that something is a drug that's regulated by the government, approved by the government, manufactured in certain ways that are controlled by the government, and therefore has benefits and costs more. That's what those terms mean to consumers. And you don't just need to take my view for it. Read ER 258, which is the FDA's guidance on what are called medical foods. Medical foods are not drugs. They're like if you get a feeding tube at the hospital, that's a kind of medical food. So they're regulated, but they're not drugs. And in the guidance on that product, the FDA clearly states that you're not allowed to use Rx on the medical foods because it's deceptive. It falsely implies it's a regulated drug, and it's not. The same logic applies here. They can't call this prescription. If I go to the grocery store, I can't encounter Quaker Oats by prescription because it lowers your cholesterol. I'm sure my doctor would like me to eat more oatmeal, but that's not a prescription. Let me ask you this. When I read the complaint, or chunks of it that I thought I needed to read, so when I read the allegations regarding the plaintiffs, they don't say, well, I went into PetSmart, and I saw this dog food, and it said prescription dog food. And I thought, ah, that's what Max really needs. Right. Prescription dog food. No, that's right. They went to their doctor. Instead, they went to their doctor, and their doctor says, hey, Max might need some. Such and such food. And then they go to the store, and they see the food, and it's on a big shelf. And the shelf says, prescription diets require MedCare card. Right, but the vet has already told them to look for that. But the misrepresentation does not need to be the sole cause of the conduct. That's the important distinction. So actually, there are two things. The vet's telling them is not independent. It's part of the defendant's scheme. That's their whole point. Otherwise, you could all you could make any fake prescription product you want. As long as some doctor recommended it, the manufacturer would have no liability. So it's not that's not an independent intervening cause, which incidentally would be a defense and not something they would be able to show on a motion to dismiss. But that's neither here nor there. Well, it's part of whether or not there was a false representation. That's part of it. Well, Your Honor, the representation is that a prescription is required to buy the food, and that's false. There is no legal ---- So are you saying it was the vets that made that? If they didn't see the food first with the Rx or the prescription language on it, are you saying it's the vet that made the misrepresentation? I'm saying that between the vet and the purchase, they saw the representation by the defendants, because that's how they purchased it. They go to the store. They're asked, where's your prescription? On the shelf, it says, you need a prescription. They go get the med card, which looks like a prescription card with a fake Rx number on it. So the vet may have some part in that plan, and his part may be independent or it may be dependent, depending on how the facts come out, about what these guys tell the vets. You know, there's a lot of litigation in this country right now about opioid prescriptions. And the manufacturers all say, oh, well, the doctors prescribed it. It's not our responsibility. Well, that's a little different because of the ---- No, I was just going to say, vets who are not part of Banfield or what's the other ---- I think it's Blue Pearl. Blue Pearl. The ones owned by Marsh. Independent vets. And now VCA. Independent vets also prescribe, issue prescriptions for this particular kind of dog food. Well, I think the issue is not that it's improper for the vet to say, go buy X brand of dog food. What's improper is ---- Then I'll give you a prescription. Here's what you're ---- But he's giving you a prescription because he knows that the defendant won't sell it to you without one because that's a requirement they imposed, not that the law imposed. The consumer doesn't know that. They just made up their own requirement to segment this market so people would pay more for this food. And they all did it. They all do it exactly the same way in connection and combination with each other and with PetSmart and Banfield to enforce that. And another point, the other point I want to make ---- Did you allege that the reason why the vets give a prescription for it is because they know that pet care and others require it? You just said, yeah. Did you allege that? I don't know that those specific words are in the complaint. I think that's a fair inference that should be drawn from the facts we alleged. And we're entitled to inferences in our favor on a 12B6 motion. PetSmart has admitted in pleadings, which we quote in the complaint, that the only requirement here is one that it has agreed with the manufacturers to impose. But that's a huge inference to say that the vets know that the only way that they can get that food is for them to write a prescription for it, that it won't be sold otherwise. That's a big inference. It could be that the vets think this is the best way for that food to be distributed among the pet population. It could be, but the vet is not. In your hypothetical, the vet is not telling the consumer, the only way you can buy this food is with a prescription. And that's what's false. That's what you said. You said that the vets write the prescription because they know that's the only way that this food will be sold to the pet owner. But I did not say that they tell the consumer that. The people that tell them. No, but I'm saying that's an inference. You asked us to draw that inference, and I said that's a big inference for us to draw because there are other reasonable inferences that could also be drawn from that statement. I understand that there are. So I would say two things. One, that's only one small segment of this case. So if the Court thinks that this case should be properly limited to people that got the food with prescriptions through Banfield, which is part of this combination embedded in the PetSmart store, then, you know, we weren't given that. Those distinctions were not drawn by the district court. The district court just threw the whole thing out. But we're here on de novo review. Right. So we can explore all of the parameters. But if we just limit it to Banfield, then that doesn't address Judge Payas' concern that there were vets who were not part of the Banfield family who also wrote these prescriptions. You're not saying it's illegal for the vet to tell you to buy a certain kind of food or even for the vet to use a prescription pad to do it. What's illegal is to tell consumers, and then actually do this, we won't sell you the food without a prescription, because that implies that that's a government requirement, and it's the same as the requirement for drugs and comes with the same benefits and reasons for higher costs as for drugs. That's the issue in the case. And the defendants have, I think, very skillfully sort of diverted attention to the vets. But the vets are beside the point. It's not independent. But even if it was, I don't need to prove sole cause. I just need to prove that it's an important cause. But didn't you refer to vets in your complaint? Of course we did. Well, why would it be diversionary for them to address it if you referred to it in your complaint? Because vets are only one part of a constellation of fraudulent conduct that's occurring here, and they just want to focus on that. And the other thing they want to focus on, just to shift a little bit, is this notion that the FDA has somehow approved their conduct through its enforcement guidelines because they're flying under the FDA's radar. That's nonsense. The CPG does not authorize anything. It expressly says this food is adulterated and misbranded and should not be sold. They're not supposed to sell this food. And what the CPG is saying is, even though it's illegal, we're not going to exercise we have limited resources. We're not going to put our resources there as long as you do the following things. That is not an authorization. It looks like Judge Murphy has a question. Well, you said that the getting back to this business about the vets, you said that the district court did not get down in the weeds about that. The district court did get into the weeds on reliance and causation generally, didn't it? Generally, but, for example, the district court did not analyze the fact that PetSmart, whatever is on anybody's bag, PetSmart, in its store and on its website and at its cashier's point of sale, tells everybody you need a prescription and uses the Rx symbol. But don't you have to show that the plaintiffs relied on the representation that you need a prescription, and their reliance upon that caused them damage? No, Your Honor. I have to show under California law, I have to show that the representation was material and that an inference of reliance arises. And that's very clear under this Court's law, interpreting California law and California case law. I do not. It's not a standard fraud claim. So you don't have to allege reliance at all? I don't have to prove actual reliance. All I have to prove is that a material misrepresentation was made and such that a reasonable consumer would be — would rely. And then there's an inference of reliance that arises. Now, they might disagree that it happens. Well, for damages, you know, once you get down to damages, then you have to go back a little bit and show that they relied, and as a consequence, they were damaged, right? This was a case where my clients bought one bag of dog or cat food each. That might be a problem because the vet said go buy this. But it's not that case. They bought this food repeatedly for a long time from the same store where they're exposed to this. And, in fact, some of them went to other stores and tried to buy it and were told they couldn't because they didn't have a prescription as part of the manufacturer's same scheme. So I'm not concerned about proving that, but that's not why we're here, Your Honor. We're — I don't have to prove my case today. We have to prove that you properly pledged your case today. You have to prove that. Are you saying that your pleadings don't fall under — that your case doesn't fall under Rule 9b? No, I'm not saying that. I'm saying that 9b in the context of a UCL claim allows the State's inference of reliance. And I mean, that's — So tell me your strongest case for the proposition that you don't have to specifically plead reliance, but you're able to rely on an inference of reliance. What's your strongest case for that proposition? In Friedman v. AARP two years ago, 855f3rd at page 1055, this Court, citing Tobacco II and Chapman States, to establish a fraud claim under the UCL, a plaintiff must demonstrate actual reliance. However, quote, actual reliance for purposes of a UCL claim is inferred from the misrepresentation of a material fact. We plead the misrepresentation of a material fact. What's the material fact that you say results in an inference of reliance? Which material fact? That the food is only sold by prescription. I mean, that's the whole point of this. The reason they're able to do it is the material fact, their assertion of prescription in Rx, and the material inference that's drawn from that, that the government has regulated the sale of this food. I see that I'm at just over two minutes. Breyer, I'll give you an extra minute just to address the antitrust claim. Just briefly, Your Honor, on the antitrust claim, there's two important points. One, there's clearly a combination here, because they do this together. If they didn't do it together, it wouldn't work. What's the combination? At a minimum, you call it a strategic or whatever, strategic arrangement. Yeah. You know, it's difficult. Words don't always fit the creativity of the defense when they make up these things. But there is clearly an actual agreement, and we allege one, an actual agreement between each manufacturer and Petsmart and Banfield. There's a distribution agreement that Petsmart enforces when it restricts the sale of the food in the way that it has agreed to do. And then we also infer that this is not an accident, that all of these defendants are doing the exact same thing through Petsmart and other people in the same way. Does it matter that they started selling the food at different times? It doesn't, because we're not arguing simultaneous adoption, which would be another element. There's different periods of time. Well, yes and no. Yes and no, Your Honor. Hills was doing this in a very small way for a very long time. And then in 2004 to 2005 — Does it matter if it's a small way? If you're arguing that there's a combination or a conspiracy or an agreement, whatever word you want to use, does it matter that it was only in a small way if the agreement is predicated on that? What I'm saying is that Hills engaged in some small market share of conduct and then got together with Mars and agreed to do it on a larger scale through Mars' captive Banfield vets in combination with Petsmart. And then about a year later, we allege Purina started doing the same thing. So there's only about a two- or three-year gap there. The other thing, though, is the other distinction — — that it's not in their — that they could have done this — you have to show that — you have to negate the fact that they could have done this innocently, and that is that there were good economic reasons for them to do the same thing and not to do it by conspiracy. Right. And thank you, Your Honor, because that takes me to my next point, which is the other important distinction. If this is not lawful conduct, it is true that — But wait a minute. There are innocent reasons why Purina would do the same thing. No, because it's not lawful. So the law allows — the law says it's not enough to allege parallel conduct if it could be rational legal business behavior. That's — Yes. And my medical instrument says that. Kendall says that. This is not rational legal business behavior for two reasons. It violates the FD&C Act because the food is misbranded and shouldn't be sold in the first place, and it constitutes a consumer fraud. So that — the illegal nature of the conduct is the plus factor that we need to show that them all acting together through the same distributor who's also engaging in the misconduct, that's enough — that's enough to nudge us over the line. Isn't in Purina's economic best interest to do the same thing without an agreement, and that is because they can make more money selling something called prescription versus something called canine or something out of a can? I think it would be a terrible day were this Court to say that committing fraud and violating the Food and Drug and Cosmetics Act is in a company's economic best interest. Aren't there other — aren't there other small manufacturers that are not part of this that are — that are selling prescription dog food online or whatever? There's a — there's an umbrella principle in antitrust law, right, that the big parties' large illegal conduct gives some cover for small parties to do the same thing. They're not part of this suit, but, yes, and those representations are also untrue and unlawful, and that food is misbranded and should not be sold. Well, then that means, according to your theory of inference, is that they have entered into a contract combination in agreement to violate Section 1. Oh, no, Your Honor. No, because we allege very specifically that those companies aren't allowed to sell at PetSmart. They're not allowed to sell through Mars' captive vets because they've been excluded by these defendants. That's exactly the point. But they could sell to — they could sell to regular vets — I mean, to independent vets. Unfortunately, in this space, apparently there are a lot of people who are violating the FD&C Act and selling misbranded and adulterated pet foods because consumers don't know better. But that's not — that doesn't make it legal rational conduct. But doesn't that militate toward the principle that it's a business practice if other people who are not allowed to sell it at PetSmart are still doing it? Why doesn't that reflect a business practice as opposed to a combination? Because of the — because at the inception of this market, you needed the two and then three big players to do it, to create the market. Okay. Now the market's been established for more than a decade, and now there are smaller players popping in. But the market wouldn't exist if it wasn't falsely and artificially created by these defendants. All right. Let's hear what — let's hear from the defendants. Thank you. Thank you. Good morning, Your Honors. John Hacker for Defendant Hills. I'll be arguing for the first 10 minutes on behalf of all the manufacturers addressing the consumer protection issues, and Mr. Schmitlein will argue for the remaining 5 minutes addressing the antitrust issues. I gave him an extra 2 minutes to argue, so we'll add — we'll make that 17 minutes. Okay. I'll hopefully retire at around 10 or so, either way. Your Honors, consumer protection laws exist to protect consumers who lack information and thus are left to their own devices in evaluating product labels and advertising. In this case, however, consumer protection laws are being invoked to challenge a practice that addresses exactly that problem.  The FDA recognized in its elaborate four-year compliance policy guide process the longstanding requirement of prior veterinary authorization helps protect animal health and safety because special diet products can pose a unique risk to animals when administered by consumers who do not fully understand their pet's condition or the proper use of the product. There is accordingly nothing — Counsel, what's your response to opposing counsel's position that the guidance is just kind of a stopgap measure for the FDA, this is still unadulterated, it's still illegal, and that's just the FDA's effort to try to cabin it as much as possible? What's your response? Three points, if I could. The first is that we're not relying on the CPG to approve this process, even absent the CPG, there would be nothing deceptive and they wouldn't plead reliance. So the CPG is not the reason we win, if you will. The second point, however, is that the CPG does absolutely confirm the importance of prior veterinary authorization in the marketing and sale of these products. The CPG explicitly says there is a grave risk to pet health and safety if these products are sold without veterinary authorization. Are there any drugs in these products? No. Any medicine in these products? No, not that I'm aware of. Isn't it when you see an RX, isn't that what you generally think a reasonable consumer would think that these products have drugs and or some sort of medicine of some, you know, some sort of medicinal? So I think the answer is no. Why not? RX is a symbol for prescription. Right. And a reasonable consumer, when he or she sees that RX sign, the immediate connection is medicine or, you know, drugs. If I can be precise, though, the RX symbol is a symbol for prescription. The plaintiffs themselves tell us what they think prescription means. Prescription means doctor's orders. And that's what it does. And you get doctor's orders for drugs and medicine. Not a prescription, Your Honor. Doctors prescribe things all the time. Doctors prescribe bed rest. Doctors prescribe exercise. Doctors prescribe a low glucose diet. I don't think I've seen it. I don't think I've gotten a little prescription from the doctor that prescribed bed rest RX. But in this context. I take it to my chief judge and say, Chief, look, I have an RX here for bed rest. It may not be common in the medical, in the medicine side, but for pet food, for decades, and the FDA reviewed this. Their argument is the reasonable consumer, though. I understand. But if you're looking at the word prescription, there's two things I think. Well, we have the prescription and we have the RX symbol. Yeah. Right. Now. Correct? Those are two prescription and RX are two words that appear. I think RX appears more at PetSmart, which isn't even sued in the consumer protection claims. Right? PetSmart's not. Right. I understand that. So that's a huge problem for them on the RX symbol. But looking at the words prescription, there's two separate points here. They're saying it's not just about prescription. They're saying it's illegal to require prior veterinary authorization. That is the groveling of their complaint. And there is nothing deceptive about that basic point. To require an expert to sign off on the use of a product is literally, Your Honors, literally the opposite of deception. It's giving the consumer knowledge, requiring the consumer to have knowledge they wouldn't otherwise have. But you didn't. You never answered my question about whether or not you challenge the position of opposing counsel that the FDA has determined that these foods are illegal and adulterated products. Right. So that's my question. Did you challenge that? Yes. The FDA hasn't reviewed these particular products. The FDA reviewed the category of products that were labeled. That's the first sentence of the CPG, is addressing products labeled to treat diseases. And then it goes through a process four years after four years of review and lays out 11 factors under which the FDA will exercise enforcement discretion and not pursue and not challenge the marketing of products that are used to treat animal diseases and says that it's not going to challenge them if those and all of these products satisfy all 11 of those requirements. So these products, and the argument here is not, to be clear, Your Honor, the argument here is not that this is these, the labeling is deceptive because it's misbranded under the FDCA. You won't see that in the opening pages of the brief. The argument is these products are deceptive because you are required to get veterinary authorization and to consult with a veterinarian before purchasing the product. But opposing counsel says when you get to the store and you see RX and you have a prescription, there is an inference that these have been approved by the FDA for consumption by the pet. What's your response? A couple points on that. First of all, to the extent we're talking about just veterinary authorization in general, that can't possibly be deceptive to require expert consultation. To the extent we're talking about the word prescription, again, that means by their own account of paragraph 43 of their complaint, that just means doctor's credit. But moreover, then you get to what the district court said, which is they have a huge reliance problem on the word prescription and RX because, as Judge Paez pointed out, when you get to the specific allegations at paragraph 101 to 107 of the complaint about what the circumstances of the alleged fraud was as required under Rule 9b, when you get to those allegations, none of them say they saw the word prescription, saw the RX symbol, and purchased because they saw that and because they thought the word prescription means, you know, FDA approved. You won't find those allegations at paragraphs 101 to 107. What you do find is an allegation that pleads them completely out of court. And that's the allegation that I think Your Honors addressed in the earlier argument, which is that they purchased the product because their veterinarian has recommended them. Well, a closing counsel says that's not pled because it doesn't have to be pled because there's an inference that can be drawn from the use of that phraseology. What's your response? Well, I didn't quite understand his argument on that because what I do understand is what the complaint says, which is each of these plaintiffs purchased the product because the veterinarian has recommended it. That's why the purchase was made. There isn't an allegation as to any of the individual plaintiffs that they purchased the product, that they got the recommendation from the veterinarian and then said, well, I don't really want to purchase it, for example. Aha, but I see the word prescription, therefore I will. Or put differently, there's no allegation at all. Well, but you can infer that, though, because they're told they're going to PetSmart with the prescription in hand and they're matching it up with a bag of dog food that says prescription. Well, some of the plaintiffs purchased it right from the veterinarian. They say that. They didn't go to anywhere and purchase it certainly in their initial purchase. I think there are a couple, though, that did say they went to PetSmart. And here's what's missing from the allegation. It is required under Rule 9B under these circumstances, given what they do allege about the veterinarian recommendation. What they would need to allege to establish reliance is that they had their veterinarian recommendation, but if they had known the truth, the so-called truth that these were not FDA approved, if they had known that, they would have ignored their veterinarian recommendation. They would have not purchased these products. They have to allege a claim under the CLRA and UCL, as this court in Davidson said, they have to allege that they would not have purchased the product if they had known the so-called truth. The so-called truth here is that these products were subject to a new drug approval process by the FDA. Their allegation is that the veterinarian said, this is necessary for your sick pet. That's their allegation. To establish that they relied on the idea that this was subject to a new drug approval process, they would have to allege specific facts establishing that they were prepared to ignore their veterinarian recommendation for the health and safety of their pet if they had known there was not a new drug approval process. Okay. Your time is clicking down. There's eight minutes left. Well, so I want to be clear that there's not deceptive for the reasons I've said. Yes. There is no reliance for the reasons I've said. And there's a third point which the counsel didn't address, which is that they have been able to allege, as required, facts establishing that these products, another theory, if you will, that the products are not sufficiently similar. And they don't allege facts establishing that as the district court held, and I didn't hear any contrary arguments. So you're not addressing the antitrust claim? No. So if you're ready for antitrust, I'm happy to further my test. Okay. That's okay. Let's hear from your co-counsel. Good morning, Your Honors. May it please the Court. I'm John Schmitlein from Williams & Connolly. I represent Mars Pet Care, Medical Management, Banfield, and Blue Pearl. And I'll be addressing the antitrust claim today.    There is no reliance for the reasons I've said. The antitrust claim in this case is Section 1, combination conspiracy. That is, we understand it was a conspiracy that somehow the defendant manufacturers of these pet foods, in combination with some number of the retailers, agreed that they all, including a horizontal element amongst the different manufacturers, that they would all somehow only market some number of these foods with a prescription requirement. And thereby charge higher prices. There is actually no allegation of price fixing. There is no allegation in this case. Well, I thought there were allegations in the complaint that that allowed them to charge a higher price because they had the label prescription. They claim that the effect of that somehow allows us to do it, but there's no claim that we're not actually competing on price in the sale of these foods. But part of the allegation is that you were able to charge higher prices under the rubric of it being a prescription. Right, although we're supposedly competing on price with this alleged deception going on. Yeah, but at a higher price for everybody because the combination allows higher prices to be charged for ostensibly prescription. It's a fine point. Yeah. I candidly have never understood how this conspiracy would work in the absence of a second price-fixing agreement amongst the parties to actually not compete on the price down because they also sell. Well, it could work. It could work if everybody is charging more than manufacturers who are not selling so-called prescription, but they still can compete in that higher market. I suppose, but they don't allege that second type of horizontal agreement. And I think as Your Honors sort of recognized and I think as Judge Chesney recognized, it's a very, very strange set of facts that they try to establish to get past Twombly and this Court's subsequent interpretations of Twombly in the Kendall case versus Visa and in musical instruments. Twombly is very, very clear that conduct that is as consistent or as explainable by unilateral conduct, parallel conduct even, consciously parallel conduct by itself. What's the economic incentive for the people to be all acting the same on this? Well, here we don't even really have the parallel conduct. Hills began doing this decades ago. Hills introduced a line of prescription pet food. They say, oh, it wasn't really a big deal. Okay, but then there were others who started doing the same thing. Right. And in seeing how that that was a successful line of products, that it was doing well in the market, they say because it was a threat to Mars, the products had done well, was presumably taking away business and sales from the non-prescription pet food products. In response, Mars introduces a competing line of products. Decades later. They have no allegations about, oh, well, we know because we've got a former disgruntled employee. We've got documents. We have direct evidence that there was actually some agreement. I'm not even sure what it would be. That Mars knocked on Hills' door and said, we're coming in. We're going to compete with you. Don't rat us out. We won't rat you out. I'm not sure what the agreement is, but Mars decides to compete with Hills in offering this competing line of food. And they've watched Hills do this successfully for decades without any action taken by the FDA, without anybody alleging that the practice was deceptive, and with this veterinary requirement that you have to get some sort of authorization to buy it at retail. So Mars enters in somewhere in the 2004-2005 time period and does the exact same requirement. This is in some ways very similar to the vertical. These are vertical agreements. I agree with PetSmart. I will sell you or give my product to you if you impose the veterinary requirement. It's similar to the individual vertical agreements you all looked at in the musical instruments antitrust case. In that case, it was minimum advertised pricing policies with, candidly, a lot more specific factual context that might have suggested an agreement. In that case, the Ninth Circuit said, you know, the fact that these individual vertical agreements were established at different points of time really undermines the notion that there was some horizontal agreement amongst all of them to do the same thing. Respectfully, I would say the facts here are even more dramatic than in that case. They negate any sort of inference of horizontal conspiracy even more there. But we have even more here because the other arguments, the other sort of plus factors, whether you call them that or not, that they rely on can't possibly provide any reasonable inference of a horizontal agreement. They say, well, gee, this was so clearly unlawful conduct. Why would Mars do this unilaterally? I think, as Your Honor said, it would make no unilateral economic sense for Mars to enter this market in response to Hills unless there was somehow a proceeding agreement. Well, you know, respectfully, Judge Chesney had it absolutely right to reject that inference. Hills had been doing it successfully on their own for decades. They didn't need an agreement from anybody to make this rational. And as Your Honor pointed out, we've got three new companies that have come in to the market doing supposedly the exact same thing, and they're not part of the conspiracy. Well, they say, well, no, but we've created the umbrella. Well, why is the umbrella that supposedly exists today for these new companies, why isn't that the same umbrella that existed for Mars or the same umbrella that existed for Purina years ago when they decided to come in and try to compete with these products that, again, nobody has ever, until this case, sued or taken action to suggest that it's a deceptive or it's so unlawful that it wouldn't make sense to do. When looking at whether conduct is economically so irrational that it must suggest it can only be explained by conspiracy, I believe this court in the musical instruments case described it as conduct that is so perilous in the absence of advance agreement that no reasonable firm would make the challenge without the agreement, would engage in the conduct. The mere launching and responding with more competition in a line of goods I respectfully suggest does not, does not make that. The other arguments that they make about sort of plausible plus factors, whether it was responding to the CPG through a trade association, that is common conduct reaffirming our position, sort of telling the FDA here's our position on this conduct, that doesn't push the needle to suggest that a decade before there was any sort of a conspiracy. And last I would suggest that the fact that these other new manufacturers with very small market shares haven't gotten uptake at a Petsmart, that obviously can be explained by any number of reasons. The fact that every cola manufacturer doesn't get into Safeway doesn't mean that Pepsi and Coke have conspired to exclude them. I see my time is up. Thank you, Your Honor. Thank you. I'll give you a minute. A few very quick points in response. Judge Rawlinson, you're right. He didn't answer your question. They didn't deny the food is adulterated because it is. And if you read the CPG at 279 and 280 of the record, it does not say the FDA agreed not to challenge their products. That's false. It says they are, quote, less likely to initiate an enforcement action. That is nowhere near authorization or saying they won't challenge it. That's just nonsense. This food, they're not supposed to be selling it this way in the first place. The fact that they're flying under the FDA's radar does not make it legal. And that is also a distinction between this case and in-ray musical instruments. The conduct in that case was wholly legal. There was no allegation that the vertical agreements were in any way independently illegal. They are here. That's the difference. The last point I'd like to make on the antitrust claim is the question is asked, well, why didn't Mars fall under the umbrella that Hills had created? The big box store is the difference. It's the combination of PetSmart with 80-plus percent of its stores having a vet embedded in it that fundamentally changes this market from one where you go to small veterinarians and might buy a bag of dog food to one where the dog food, the prescription food is competing at a higher price point with non-prescription food in the big box stores. That's a fundamentally different sub-market that they created through their conduct. And that's the focus. Counsel, what is your response to opposing counsel's position that your argument regarding the higher price is not persuasive because you didn't assert price-fixing? Price-fixing is anything that alters the market's price points. We don't have to allege that they all agreed to charge $69.99 for the same volume of dog food. We do allege very clearly that they segmented the market to create a more expensive class of dog food through this market manipulation and improper conduct. That is a form of price-fixing. That creates and stabilizes a higher bracket, a higher echelon of prices. The fact that they compete with each other in that higher echelon does not mean it's not price-fixing because what they're not doing is competing with the non-prescription food for price. They're charging three to five times more than the non-prescription food. And, you know, the Sherman Act prohibits any kind of market manipulation that harms the consumer. It doesn't specifically require that they all agree to the exact same price in order for their conduct to be illegal. So, Your Honors, we would ask that the Court reverse. Thank you. Thank you very much. We appreciate your argument. Safe travel. And the matter is submitted at this time.
judges: Murphy, Paez, Rawlinson